**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALANDSTACY CORP., SALVATORI FELI, and STACY FELI, | Civil Action No.: 11-3439 (JLL) |
| Plaintiffs, | **OPINION** |
| v. | |
| DWIGHT FREENEY, et al., | |
| Defendants. | |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendants' Motion to Dismiss Plaintiffs' Complaint for failure to state a claim on which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). [Docket Entry No. 9]. The Court has considered the Parties' submissions made in support of and in opposition to the instant motion and decides the motion without oral argument pursuant to Fed. R. Civ. P. 78. Based on the reasons that follow, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## I. BACKGROUND

The matter arises from a contractual agreement entered into by Plaintiffs SalandStacy Corp. ("S & S"), Salvatori Feli and Stacy Feli, as individuals and sole officers and shareholders of S & S ("Plaintiffs"), to manage, operate and provide services for the Rolling Stone Los Angeles ("RSLA") restaurant, lounge and bar on behalf of Defendant Roof Group, LLC ("Roof Group") and individual officers thereof, including

1

Dwight Freeney ("Freeney"), Aaron West ("West"), and David M. Millar a/k/a Michael Millar ("Millar")("Roof Group Defendants").  After entering a License Agreement with Rolling Stone Licensing, LLC, through which it received the right to develop RSLA, Roof Group and the Roof Group Defendants entered into negotiations with Plaintiffs in April 2010 to manage and operate said establishment. (Compl., ¶¶ 23-25).  Prior to Plaintiffs' signing of the agreement on May 13, 2010, Plaintiffs allege that the Roof Top Defendants made a series of false statements to induce them to relocate their family from New Jersey to Los Angeles to manage and operate the RLSA.  (Id., ¶¶ 17, 23-33). Specifically, Plaintiffs allege that Defendants made the following fraudulent statements: (1) Defendants Freeney, West and Millar told Plaintiffs that they would have full control over the management and operation of RSLA (Id., ¶ 24); (2) Freeney, West and Millar told Plaintiffs that RSLA was fully funded with all capital necessary for its construction based on Freeney's financial resources resulting from his $72 million contract with the Indianapolis Colts in 2007 (Id., ¶¶ 26-27); (3) Defendants West, Millar and Eva Weinberg ("Weinberg"), Freeney's financial advisor, told Plaintiffs that Millar could ensure adequate capital in the amount of a $7 million line of credit, and representing that Millar was a "multi-millionaire owning a private airplane and multiple private Caribbean island homes" when he was not in fact a wealthy individual, had not invested in Roof Group and did not own the airplane or the homes (Id., ¶¶ 12, 28-30).  These statements are alleged to have occurred during meetings which in Miami and New York, and specifically during a meeting in New York City on April 13, 2010 when the Roof Group Defendants and Plaintiffs met with Rolling Stone Executives Tommy Cohn, Jann Wenner and John Ruber.  (Id., ¶ 23).

Plaintiffs allege that, based on such representations by the Roof Group Defendants and Ms. Weinberg, they signed a five-year written agreement ("Agreement") with Roof Group on May 13, 2010. (Id., ¶¶ 17, 21). The Agreement specified Plaintiffs' annual compensation and benefits, and contained provisions regarding: (1) the ownership, operation and management of RSLA ("The Company will own and operate a restaurant known as 'RSLA' located in Los Angeles, California (the 'Restaurant'). Company shall enter into a Management Services agreement (the 'Agreement') with SalandStacy Corp, a New Jersey corporation ('S & S') to manage and operate the Restaurant (the 'Agreement'). Sal & Stacey must be included"); and (2) Plaintiffs' membership interest in Roof Group, LLC ("The Company shall issue to S&S a two percent (2%) membership interest (the 'Interests') in the Company on the effective date of the Agreement. Such Interests shall vest as of the first twelve (12) month period that the Restaurant generates gross revenues of $6 million dollars or more (the 'Vesting Event'). After Gross of 6 million."). (Id., ¶¶ 18-19; Defs. Mot. to Dismiss, Ex. A, "Term Sheet between SalandStacy Corp and Roof, LLC"). The Agreement also contained a provision allowing for termination by the Company only for cause. (Defs. Mot. to Dismiss, Ex. A, "Term Sheet").

In or about August 2010, Roof Group, and specifically Defendant Weinberg, retained Defendant Krost, Baumgarten, Kniss & Guerrero ("KBKG"), an accounting and consulting firm of whom Defendant Gregory Kniss ("Kniss") was a certified public accountant and principal shareholder. (Compl., ¶¶ 14-15, 34). KBKG was retained to perform RSLA's accounting services, and following their retention, allegedly "engaged in a scheme to induce Roof Group to breach the Agreement [with Plaintiffs] and to

3

interfere with the contractual relationship between Plaintiffs and Roof Group." (Id., ¶ 35). Specifically, KBKG and Weinberg: (1) "repeatedly made false and defamatory statements to Freeney and West about the nature and quality of services rendered by S&S" (Id., ¶ 37); (2) "repeatedly interfered with S&S's duties to attempt to prevent S&S from fulfilling its obligations under the Agreement" (Id., ¶ 38); (3) Weinberg falsely blamed S&S "for her own mistakes including failures to pay invoices on time as well as pay employees their proper wages" (Id., ¶ 39); and (4) attempted to force S&S "out of its position by causing Roof Group to demand that Plaintiffs agree to an amendment of the Agreement which would drastically reduce the agreed upon Base Fee and contingent compensation from RSLA and other locations, and to change other terms of the Agreement." (Id., ¶ 40). On November 2, 2010, Defendants Weinberg, Kniss, West and Jean Hagen ("Hagen"), an employee of KBKG, met with Freeney in Indiana and allegedly convinced him to terminate S&S in the event that Plaintiffs refused to amend the Agreement. (Id., ¶¶ 16, 41). When Plaintiffs did offer to amend the Agreement following this meeting, Defendants rejected their offer and KBKG allegedly convinced Roof Group to terminate the Agreement without cause. (Id., ¶¶ 42-43). On December 22, 2010, Roof Group notified Plaintiffs that they were terminating the Agreement on the basis that S&S refused to amend the Agreement quickly enough. (Id., ¶ 44).

Plaintiffs filed the instant action on April 13, 2011 in the Superior Court of New Jersey Law Division, Essex County, and on June 14, 2011, Defendants removed the Complaint to this Court. [Docket Entry No. 1]. Plaintiffs' Complaint alleges: (1) two counts against Roof Group for breach of contract and for an accounting; (2) one count against the KBKG Defendants and Weinberg for tortious interference with contract; and

(3) three counts against the all Roof Group Defendants for conversion, fraud, and breach

of fiduciary duty.  Defendants' Motion to Dismiss seeks to dismiss some but not all of

Plaintiffs' claims: (1) the conversion, fraud and breach of fiduciary duty claims as against

the Roof Group Defendants; and (2) the tortious interference with contract claim as

against the KBKG Defendants and Weinberg.  (Def. Br., at 2-3).  In the alternative,

Defendants argue that this Court lacks personal jurisdiction over Defendants due to

Defendants' lack of minimum contacts with this forum.  (Id., at 3).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) states that a defendant may move to

dismiss a complaint for "lack of personal jurisdiction."  Fed. R. Civ. P. 12(b)(2).  A court

has personal jurisdiction over a nonresident defendant or defendants only to the extent

authorized by the forum's long-arm statute.  M. Eagles Tool Warehouse v. Fisher

Tooling, 205 F. Supp. 2d 306, 311 (D.N.J. 2002).  New Jersey's long-arm statute permits

the exercise of personal jurisdiction over a non-resident defendant "consistent with due

process of law" and to the extent permitted by the Fourteenth Amendment of the United

States Constitution.  N.J. Sup. Ct. R. 4:4-4(c)(1); Weber v. Jolly Hotels, 977 F. Supp.

327, 334 (D.N.J. 1997).  The Fourteenth Amendment requires (1) that the "defendant

have constitutionally sufficient 'minimum contacts' with the forum,'" and (2) that

"subjecting the defendants to the court's jurisdiction comports with 'traditional notions of

fair play and substantial justice.'"  See Burger King Corp. v. Rudzewicz, 471 U.S. 462,

474 (1985); Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

A court may exercise general or specific jurisdiction over non-resident

defendants.  General jurisdiction is based on the defendant's "continuous and systematic"

contacts with the forum state. Eagles Tool Warehouse, 205 F. Supp. 2d at 312 n. 8

(citing Remick v. Manfredy, 238 F.3d 248, 255 (3d Cir. 2001)). Specific jurisdiction

arises only when the plaintiff's claim is related to, or arises out of, the defendant's

contacts with the forum. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S.

408, 416 (1984). To establish whether specific jurisdiction exists over a non-resident

defendant, the court engages in a three-part inquiry: (1) whether the defendant

"purposefully directed" its activities at the forum; (2) whether the litigation "arise[s] out

of or relate[s] to" at least one of those activities; and (3) whether the exercise of

jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" O'Connor v.

Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007). When a defendant raises the

defense of the court's lack of person jurisdiction, the burden falls on the plaintiff to come

forward with sufficient facts to establish that jurisdiction is proper. Mellon Bank PSFS,

Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992). In evaluating a movant's

motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), "courts must accept the plaintiff's

allegations as true and construe disputed facts in favor of the plaintiff." Machulsky v.

Hall, 210 F. Supp. 2d 531, 531 (D.N.J. 2002)(citing Carteret Sav. Bank, F.A. v. Shushan,

954 F.2d 141, 142, n. 1 (3d Cir. 1992)).

        In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a district

court is "required to accept as true all factual allegations in the complaint and draw all

inferences from the facts alleged in the light most favorable" to the plaintiff. Phillips v.

County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008); see also Bell Atlantic Corp. v.

Twombly, 127 S.Ct. 1995, 1965 (2007). "However, a court need not credit either 'bald

assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss."

Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005).   A complaint survives a Rule

12(b)(6) motion to dismiss if it states a claim to relief that is "plausible on its face"

regarding plaintiff's entitlement to the relief sought.   Twombly, 127 S.Ct. at 1965-66.

This standard is satisfied only when a plaintiff "pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Ashcrof v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

      Fraud claims must meet a heightened pleading standard under Fed. R. Civ. P.

9(b), which requires that "in all averments of fraud or mistake, the circumstances

constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "To

satisfy this heightened standard, the plaintiff must plead or allege the date, time and place

of the alleged fraud or otherwise inject precision or some measure of substantiation into a

fraud allegation." Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007).   The

plaintiff must also allege "who made the purported misrepresentations and what specific

misrepresentations were made." Id.


## III.  DISCUSSION

### 1.  Personal Jurisdiction Over Defendants

      The Court will first address Defendants Motion to Dismiss this action for lack of

general or specific jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 12(b)(2).

First, aside from Roof Group itself, Defendants allege insufficient minimum contacts

with this forum on the basis of this Court's specific jurisdiction.[1]  Defendants argue that

they did not direct any activity towards New Jersey in connection with the dispute, and

---

[1] Roof Group voluntarily submitted to this Court's jurisdiction by filing counterclaims against Plaintiffs.
[Docket Entry No. 10].  (See also Defs. Mot. to Dismiss, at 25 n. 9).

that the Agreement at issue was "signed in California, with a California limited liability company, following discussions that occurred in California, Florida, and New York, about a business that would operate in California." (Defs. Br., at 25-26). Further, the KBKG Defendants are all citizens of California and provide services to RSLA in California. (Id., at 26). Thus, the "only connection with New Jersey comes from Plaintiffs who, despite moving to California to operate RSLA, are citizens of the state." (Id.). Second, Defendants claim that Plaintiffs cannot establish general jurisdiction as Defendants have not had "systematic and continuous contacts" with New Jersey, stating that: (1) none of the individual Defendants is a resident of or owns property in New Jersey; (2) KBKG is a California corporation based in Pasadena, California; and (3) Defendants have no bank accounts or offices in New Jersey, nor do they pay taxes or conduct business in New Jersey. (Id., at 26-27). Finally, Defendants assert that exercise of personal jurisdiction over them offends established notions of fair play and substantial justice in that: (1) it is unduly burdensome to Defendants, who are all citizens of California and other states, to defend this action in New Jersey since they have no other contacts with New Jersey; (2) New Jersey has no interest in the dispute aside from providing a convenient forum for its residents; and (3) New Jersey's interest in the dispute is diminished since Plaintiffs chose to contract with a California company and to provide services in California, so California law will likely govern the Parties' dispute. (Id., 28-29).

In Plaintiffs' Opposition Brief and Plaintiff Salvatore Feli's sworn declaration, Plaintiffs allege a series of purposefully directed activities towards New Jersey which "form the basis of personal jurisdiction and . . . evidence of the contacts sufficient to

8

overcome Defendants' motion." (Pls. Opp'n Br., at 29).  Specifically, Plaintiffs state the

following facts in support of establishing sufficient contacts with this forum: (1) the Roof

Defendants hired a New Jersey corporation (S & S) to avail themselves of the services of

its New Jersey shareholders to supervise and oversee all Roof Group operations (Pls.

Opp'n Br., at 29); (2) Defendants agreed that Plaintiffs would initially perform those

services from New Jersey and that Plaintiffs would return to New Jersey after the opening

of the California restaurant in order to open a New York restaurant which they would

supervise (Id.; Aff. of Salvatore Feli ("Feli Aff."), ¶¶ 5-6); (3) Plaintiffs' services under

the Agreement prior to the alleged breach were performed mostly in New Jersey, from

April 2010 until September 8, 2010 (Id.); (4) during that period in which Plaintiffs

provided services to Defendants from New Jersey, Plaintiff Salvatore Feli worked nearly

seven days a week in New Jersey and was in constant contact with Defendants Freeney,

West, Millar and Weinberg from New Jersey (Pls. Opp'n Br., at 30; Feli Aff., ¶ 6); (5)

from April to September 2010, Plaintiff Salvatore Feli made no less than five calls a day

from New Jersey to the Roof Defendants or for the Roof Defendants' business, and there

were numerous telephone calls, e-mails and text messages exchanged by Plaintiffs from

New Jersey with the Roof Defendants regarding the Agreement with Plaintiffs (Pls.

Opp'n Br., at 30; Feli Aff., ¶ 4); (6) numerous telephone calls, e-mails and text messages

were exchanged by Plaintiffs from New Jersey with the Roof Defendants regarding

Plaintiffs' services for Roof Group, including: (a) a conference call with the restaurant's

designer from the Felis' home in New Jersey; (b) Plaintiffs traveled in the Tri-State Area

for a meeting with Rolling Stone magazine executive management; (c) Plaintiffs received

the venue's updated floor plan in New Jersey via e-mail and forwarded it to West; (d)

Plaintiffs drafted financial projections in New Jersey; (e) Plaintiffs executed the Agreement in New Jersey; (f) Plaintiffs prepared the opening budget in New Jersey; and (g) Plaintiffs received numerous payments in exchange for services while present in New Jersey. (Pls. Opp'n Br., at 30-31; Feli Aff., ¶¶ 7-8).

Plaintiffs cite to Schley v. Microsoft Corp. to support their contention that the contacts as listed in their Complaint and the supporting affidavit to their Opposition Brief are sufficient to establish minimum contacts. See 2008 U.S. Dist. LEXIS 96059, at * 26-35 (D.N.J. Nov. 24, 2008). In Schley, plaintiff job candidate alleged, inter alia, breach of contract, fraud and tort claims against defendant Microsoft and its associate general counsel. In finding that plaintiff had met his burden in establishing the court's personal jurisdiction over the associate general counsel, the court reasoned in part that, since the associate general counsel "purposefully directed her activities at the forum state by conducting extensive employment negotiations with the Plaintiff while he was in New Jersey and encouraging him to quit his job, thus availing herself of the New Jersey labor market and purposefully inducing the Plaintiff to take actions that she knew would affect him and his family in New Jersey." Id., at * 31. The court further found that plaintiff's contract and tort claims arose out of these actions, and that the extension of personal jurisdiction comports with fair play and substantial justice because defendant's "alleged actions were not "'random,' 'fortuitous,' or 'attenuated,'" but rather represented a concerted effort to engage the Plaintiff in New Jersey and to induce him to take specific actions that she knew would harm him in his home state." Id.

First, the Court finds that Defendants have sufficiently met the "minimum contacts" requirement to justify personal jurisdiction. Under New Jersey law, "the

'minimum contacts' requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Blakely v. Cont'l Airlines, 164 N.J. 38, 67 (2000)(citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980)).  Accepting as true the allegations made in Plaintiff's Complaint, Plaintiffs sufficiently show that Defendants approached Plaintiffs to enter the Agreement, thus availing themselves of the New Jersey labor market to facilitate the establishment, management and operation of RSLA. (See Compl., ¶¶ 17, 23).  Plaintiffs' supplemental Affidavit is even more specific with respect to Defendants' purposeful conduct: not only did Defendants approach Plaintiffs in the first instance, but they also communicated with Plaintiffs through phone calls, e-mails and text messages while Plaintiffs were in New Jersey in April and May of 2010. (Feli Aff., ¶ 4).  Thus, the Court finds that the contacts resulted not from Plaintiffs' unilateral activities, but rather from Defendants' purposeful conduct.

Further, the Court finds that Defendants' contacts are sufficient to establish this Court's specific jurisdiction over the Defendants.  Having first determined that Defendants purposefully directed their activities at the forum, the Court now assesses whether the litigation arose out of or in relation to at least one of Defendants' activities. Since the Plaintiffs' contract and tort claims are centered around allegations of Defendants' inducement of Plaintiffs to sign the Agreement and refusal to grant Plaintiffs the benefit of that Agreement, any claim of personal jurisdiction must rest on whether each of the named Defendants purposefully directed their activities towards this forum in relation to the signing of and arising out of that Agreement.  It is clear from the Complaint that all alleged contacts with this forum leading up to the signing of the

Agreement on the part of the Roof Group Defendants were made prior to Plaintiffs' move to California from New Jersey and were made in relation to the signing and implementation of the Agreement and services bargained for therein.  Thus, the Court is satisfied that Plaintiffs have sufficiently shown that the Roof Group Defendants' conduct in New Jersey arose from the Agreement.  Insofar as Defendant Weinberg served as Defendant Freeney's financial advisor throughout the negotiations and following the signing of the Complaint, and is also alleged to have induced Plaintiffs to sign the Agreement based on representations she made regarding adequate capitalization, this litigation may also be deemed to have arisen from her conduct as directed towards this forum.  The KBKG Defendants, however, have a more tenuous relationship to the litigation as it arises out of the Roof Group Defendants' procurement of Plaintiffs' services for RSLA.  Insofar as the KBKG Defendants are not only alleged to have induced Defendant Roof Group's breach of the agreement, and to have interfered with Plaintiffs' duties under the Agreement while they were performing those duties in New Jersey until September 8, 2010, the Court finds that the allegations in the Complaint concerning the KBKG Defendants arises out of their activities as they relate to the Agreement.

The Court also finds that the exercise of personal jurisdiction over the Defendants does not offend "established notions of fair play and substantial justice."  The Supreme Court has established a set of factors for determining the reasonableness of the exercise of jurisdiction over a non-resident defendant, and these include: "the burden on the defendant, the interests of the forum State, . . . the plaintiff's interest in obtaining relief. . . . [and] 'the interstate judicial system's interest in obtaining the most efficient

resolution of controversies; and the shared interest of the several States in furthering

fundamental substantive social policies." Asahi Metal Indus. Co. v. Superior Court of

Cal., 480 U.S. 102, 113 (1987)(citing World-Wide Volkswagen, 444 U.S., at 292). New

Jersey law closely follows the above-cited factors, stating that courts must evaluate: (1)

the burden on the non-resident defendant of having to defend itself in the forum; (2) the

interests of the forum state in the case; (3) Plaintiffs' interest in obtaining convenient and

effective relief; (4) the interstate judicial system's interest in the most efficient resolution

of controversies; and (5) the shared interests of the states in furthering fundamental

substantive social policies. Blakey, 164 N.J. at 69.

While the Court acknowledges Defendants' burden in having to defend itself in

this forum rather than in California, that burden is lessened by the fact that the Roof

Group Defendants have voluntarily subjected themselves to this Court's jurisdiction in

this matter regarding two claims in Plaintiffs' Complaint and by asserting counterclaims.

New Jersey has an interest in this case in the enforcement of contracts entered into by its

residents and business entities, and Plaintiffs have a clear interest in obtaining convenient

and effective relief in the State of New Jersey.  Further, the interstate judicial system's

interest in the most efficient resolution of controversies favors the granting of jurisdiction

in this case as denying jurisdiction with respect to four of the six claims in Plaintiffs'

Complaint would fragment all tort claims alleged to arise out of the underlying contract

dispute for potential litigation elsewhere.  Therefore, the shared interests of the states of

New Jersey, California, New York and Florida, the states in which the facts alleged in the

Complaint have occurred, favor litigation in one forum, and the granting of jurisdiction in

this Court furthers the substantive social policy of enforcing contracts made by a State's

residents and mostly executed from a single state.  While the KBKG Defendants have not waived any potential jurisdictional defects, an overall assessment of the relevant factors weigh in favor of a finding of personal jurisdiction over said Defendants.

## 2.  Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

Defendants contend that Plaintiffs' conversion, breach of fiduciary duty, conversion, accounting, and tortious interference with contractual relations claims do not meet the pleading requirements of Fed. R. Civ. P. 8(a) following Twombly and Iqbal, also claiming that Plaintiffs' fraud claims are not sufficiently pled pursuant to the heightened pleading requirements of Fed. R. Civ. P. 9(b).  Further, Defendants argue that all of Plaintiffs' tort claims should be dismissed, including their conversion, fraud, breach of fiduciary duty and tortious interference with contract claims because, under the economic loss doctrine, a tort remedy "does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."  (Defs. Br., at 22 (quoting Farash & Robbins, Inc. v. Fleet Nat'l Bank, 2005 U.S. Dist. LEXIS 33810, * 15 (D.N.J. Dec. 19, 2005)(citing Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 314 (2002))).  Plaintiffs make three arguments in response: (1) the Third Circuit does not readily apply the economic loss doctrine outside the context of product liability cases to services contracts; (2) district courts in this Circuit have not applied economic loss doctrine to fraud claims, conversion claims, or claims for breach of fiduciary duty; and (3) the tortious conduct alleged in the Complaint is extrinsic to the contract at issue.  (Pls. Opp'n Br., at 22-25).  The Court will address the applicability of economic loss doctrine to each of Plaintiffs' separate claims separately since federal and New Jersey courts have dealt differently with the various tort claims at issue as they overlap with contract claims.

14

### A.  Conversion Claim (Count II)

In Plaintiffs' Complaint, they allege that: (1) Roof Group "has failed to pay and refuses to pay S&S $6,730.05 for unpaid wages and expenses pursuant to the parties' agreement through the December 22, 2010 termination date"; (2) the Roof Group Defendants "have refused to issue and remit to Plaintiffs the membership interest in Roof Group and participation in gross revenues of RSLA"; and (3) since S&S exclusively has the right, title and interest in "membership interests, unpaid wages and expenses, and profit participation," Roof Group and the Roof Group Defendants have converted said interests and wrongfully misappropriated funds owed to S&S.  (Compl., ¶¶ 57-61).

Defendants make three arguments in favor of dismissing Plaintiffs' conversion claim.  First, they assert that Roof Group never issued membership interests to S&S since Plaintiffs had no property right in said interests under the Agreement.  (Defs. Br., at 9). Specifically, they claim, since the Agreement only provided Plaintiffs with the right to receive such membership interests following the first twelve-month period in which RSLA generated at least $6 million in revenues, and since Defendants terminated the Agreement less than twelve months into RSLA's existence, "any right S&S may have had to receive a members interest did not yet vest."  (Id.).  Second, they argue that Plaintiffs cannot state a claim for conversion based on their monetary claims since they cannot show that the money in question was identifiable as their property, that they were obligated to segregate such money for Plaintiffs' benefit, or that Defendants exercised control or dominion over any monies belonging to Plaintiffs.  (Id., at 9-10).  Third, Defendants contend that Plaintiffs' conversion claim should be barred by the economic loss doctrine since "Plaintiffs do not identify any independent duty owed to them by

15

Defendants outside the contractual relationship nor do they identify any damages independent of the alleged breach of the Term Sheet." (Id., at 23).

The Court agrees with Defendants that Plaintiffs have failed to state a claim for conversion of the membership interests, the unpaid wages and expenses, and the profit participation anticipated by the terms of the Agreement. Courts have differed dramatically on the issue of whether a conversion claim may be brought alongside a breach of contract claim under the economic loss doctrine, and since the Court finds that Plaintiffs have failed to allege a conversion claim on other grounds, it need not address the applicability of said doctrine to Plaintiffs' conversion claim here.

Under New Jersey law, "[c]onversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property." Peloro v. United States, 488 F.3d 163, 173-74 (3d Cir. 2007)(quoting McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 771 (3d Cir. 1990)(citing Mueller v. Tech. Devices Corp., 8 N.J. 201 (N.J. 1951))). When non-tangible property such as money wages or profit participation are the subject of a conversion claim, "New Jersey courts require that a plaintiff show something more than a contractual obligation on the part of a defendant to pay the plaintiff to establish conversion." Scholes Elec. & Communs. v. Fraser, 2006 U.S. Dist. LEXIS 39287, at * 13 (D.N.J. June 14, 2006)(citing Advanced Enterprises Recycling, Inc. v. Bercaw, 869 A.2d 468, 472 (App. Div. 2005)). Further, the plaintiff must show that the money in question was identifiable as plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit. See id.; Communications Programming v. Summit Mfg., 1998 U.S. Dist. LEXIS 9006, at * 5 (D.N.J. June 16, 1998)(holding that

a plaintiff had not established a conversion claim where commissions due under a
contract were not shown to be money converted that belonged to him); Hirsch v. Phily, 4
N.J. 408 (N.J. 1950)(holding that a plaintiff had set forth a prima facie case of conversion
where defendant diverted proceeds from accounts receivable which were specifically
assigned to plaintiff for its own use).  Plaintiffs here have not pled that the wages and
anticipated participation in profit were diverted by Defendants exclusively for their use,
nor have they alleged that said money was more than a mere debt that they were due
under the contractual agreement.  The Court also finds that, absent any pled facts
regarding a mutual agreement by the parties aside from the Term Sheet clearly stating the
triggering event for the vesting of the membership interests at issue, Plaintiffs have failed
to plead that they had vested rights in said interests prior to the "first twelve (12) month
period that the Restaurant generate[d] gross revenues of $6 million or more (the 'Vesting
Event').  After gross of 6 million." (Defs. Mot. to Dismiss, Ex. A, "Term Sheet").
Therefore, Plaintiff's conversion claim is dismissed without prejudice for failure to state
a claim upon which relief may be granted.

**B.  Fraud Claim (Count III)**

   In Plaintiffs' Complaint, they allege that the Roof Defendants made false
statements to induce them to enter into the Agreement, and that their reliance on said
statements harmed them due to the costs of moving their family to Los Angeles and
Plaintiff Stacy Feli's resignation from a lucrative position as an executive to work for
Roof Group.  (Compl., ¶¶ 65-68).  Specifically, as stated infra, Plaintiffs claim that,
during meetings which occurred in Miami and New York: (1) Defendants Freeney, West
and Millar told Plaintiffs that they would have full control over the management and

17

operation of RSLA (Id., ¶ 24); (2) Freeney, West and Millar told Plaintiffs that RSLA

was fully funded with all capital necessary for its construction based on Freeney's

financial resources from his contract with the Indianapolis Colts in 2007 (Id., ¶¶ 26-27);

and (3) Defendants West, Millar and Weinberg told Plaintiffs that Millar could ensure

adequate capital for the enterprise, and representing that Millar was a millionaire with a

private airplane and multiple private Caribbean island homes when he was not a wealthy

individual, had not invested in Roof Group and did not own the airplane or the homes

(Id., ¶¶ 12, 28-30).

Defendants argue that Plaintiffs fail to allege sufficient facts supporting their

claim that Defendants made material misrepresentations, with scienter, upon which they

reasonably relied, and that said reliance caused them damages. (Defs. Br., at 11).  In

particular, they make six arguments contesting the sufficiency of Plaintiffs' claims as

stated in their Complaint: (1) Plaintiffs do not specify with sufficient particularity the

false statements made by Defendants, making general allegations without time

references, dates or the actual content of the representations as required under Fed. R.

Civ. P. 9(b); (2) Plaintiffs claims fail under the Fed. R. Civ. P. 12(b)(6) standard because

the plain language of the Agreement contradicts the alleged statements regarding S&S's

full operational control; (3) due to the plain language of the Agreement and its

contradiction of the alleged false statements, Plaintiffs cannot sufficiently plead that they

reasonably relied on the false statements; (4) Plaintiffs did not state a causal connection

between the alleged misrepresentations and any damages suffered as the statements

concerning Roof Group's capital structure and the financial resources of Defendants

Millar and Freeney in no way affected any losses Plaintiffs allegedly suffered as a result

18

of the contract breach; (5) Plaintiffs fail to sufficiently allege scienter since, beyond generally stating that Defendants "knowingly" made false statements, they allege no additional facts indicating intentional misrepresentation made with intent to deceive; and (6) Plaintiffs fraud claims should be dismissed as barred under the economic loss doctrine. (Defs. Br., at 12-15, 22-23).

To establish a claim for common law fraud under New Jersey law, five elements must be met: "a material misrepresentation by the defendant of a presently existing fact or past fact; knowledge or belief by the defendant of its falsity; an intent that the plaintiff rely on the statement; reasonable reliance by the plaintiff; and resulting damages to the plaintiff." Marino v. Marino, 200 N.J. 315, 341 (2009)(citing Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 175 (2006)).  Generally, while fraud claims intrinsic to the contract are generally barred by the economic loss doctrine, "fraud claims that are extrinsic to the underlying contract, and consequently not barred under the economic loss doctrine, are claims for fraudulent inducement." Touristic Enterprises Co. v. Trane, Inc., 2009 U.S. Dist. LEXIS 106145, at *6 (D.N.J. Nov. 13, 2009); see also D&D Assocs. Inc. v. Bd. Of Educ. Of N. Plainfield, 2007 U.S. Dist. LEXIS 93867, at * 27 (D.N.J. Dec. 21, 2007)(holding that fraudulent inducement claims are not barred by economic loss doctrine); Payne v. Fujifilm U.S.A., Inc., 2007 U.S. Dist. LEXIS 94765, at * 1 (D.N.J. Dec. 28, 2007).  Courts in this district have concluded that the existence of a breach of contract claim does not preclude a plaintiff from bringing a fraud claim arising out of the same facts. See Lo Bosco v. Kure Engineering Ltd., 891 F. Supp. 1020 (D.N.J. 1995) (party permitted to sue purported joint venture partner for both fraud and breach of contract).  Therefore, since the facts alleged in Plaintiffs' Complaint occurred prior to the

contract being signed, the Court construes those facts as supporting fraudulent inducement claims and finds the economic loss doctrine inapplicable to them. Thus, Plaintiffs' fraud claims will be subject to the pleading requirements of Fed. R. Civ. P. 9(b) and may be dismissed based on the sufficiency of the facts alleged under that heightened standard.

The Court agrees that Plaintiffs' Complaint fails to sufficiently allege fraud claims against the Roof Defendants. First, the Court finds that Plaintiffs allegations regarding false statements about Plaintiffs' full control over the management and operation of RSLA to be undermined by the plain language of the Agreement which states that "The Company [Roof, LLC] shall own and operate a restaurant known as 'RSLA' . . . . Company shall enter into a Management Services agreement . . . with . . . S&S . . . to manage and operate the Restaurant. Sal and Stacey must be included." (Defs. Mot. to Dismiss, Ex. A, "Term Sheet"). Since the Agreement clearly stating Roof's ownership and operation and indicating S&S's "inclusion"—as opposed to Roof's "preclusion"—was signed subsequent to Defendants' alleged statements, the Court finds that the circumstances constituting the fraud are not stated with particularity under Fed. R. Civ. P. 9(b). While Plaintiffs may generally allege malice, intent, knowledge or other scienter requirements as to the fraudulent statement made, if said statement concerned Plaintiffs' exclusive control and the agreement they signed plainly stated that they would not have such control, then Plaintiffs need to support their inducement claims with some facts indicating how they were compelled to sign an Agreement which did not indicate on its face that such control would be exclusive.

Second, Plaintiffs' claims regarding the fraudulent statements made about Mr.
Freeney and Mr. Millar's financial resources are stated in the absence of any clear
resulting harm to Plaintiffs. At no point in the Complaint do Plaintiffs allege that the
resources of the enterprise were hindered by either Mr. Freeney or Mr. Millar's inability
to support said enterprise or to follow through with their respective obligations prior to
the alleged breach. Plaintiffs in no way indicate that the falsity of said statements even
contributed to the breach since their account of the breach centers on the KBKG
Defendants and Defendant Weinberg having induced Roof Group into said breach,
making no reference at all in their account of the breach to financial strains experienced
by any of the named Defendants. Stating that said Defendants lied about financial
resources available to the enterprise, without more, is not sufficient to establish a claim
for fraud or fraudulent inducement since, even accepting Plaintiffs' alleged facts as true,
those statements did not contribute to the harm suffered by Plaintiffs when Defendants
terminated the Agreement.

Finally, only the first two of the three statements alleged to be false in Plaintiff's
Complaint are specified as to the time, place and manner of their utterance; the statement
about Millar's adequate capitalization of the new company is generally alleged to have
occurred "[p]rior to the execution of the agreement." (Compl., ¶ 29). The context and
the circumstances of its utterance are absent from the Complaint, and while the Court
accepts as true for the purposes of this Motion the fact that Millar was not a wealthy
individual, it is not clear from the limited facts alleged that that fact alone makes untrue
his inability to secure a $7,000,000 line of credit for the enterprise.

For these reasons, therefore, the Court finds that Plaintiffs' fraud claim is deficiently pled under the heightened pleading requirements of Rule 9(b), and it is dismissed without prejudice.

## C.  Breach of Fiduciary Duty Claim (Count IV)

In Plaintiffs' Complaint, they allege that, "[b]y reason of their positions as officers and managers, the Roof Defendants owed Plaintiffs a fiduciary duty to issue the membership interest to Roof Group and pay to Plaintiffs the profit participation in the gross revenues of RSLA.  The Roof Defendants breached their fiduciary duty to Plaintiffs by failing to issue the membership interest in Roof Group and pay the profit participation." (Compl., ¶¶ 71-72).  Plaintiffs assert that their membership interest had vested by suggesting that the term "vest," while not explicitly defined in the Agreement, "means that the Interests which were required to be issued on May 13, 2010 would be subject to forfeiture in the event S&S voluntarily terminated the Agreement before the Vesting Event." (Pls. Opp'n Br., at 13).  Plaintiffs concede that no fiduciary relationship exists with Defendant Weinberg and consents to dismissal as to Ms. Weinberg. (Id., at 12).

The Roof Defendants make two arguments for dismissal of Plaintiffs' breach of fiduciary duty claim: (1) none of the Defendants had a fiduciary relationship with Plaintiffs; and (2) a fiduciary cannot breach his or her duties by causing his or her principal to breach a contract based on the "manager's privilege." (Defs. Br., at 16). First, Defendants claim that Plaintiffs' Complaint has not sufficiently pled that they were or are in fact members of Roof Group since they only had a conditional right to receive a membership interest in Roof Group after the first twelve-month period that the Restaurant

generated gross revenues of $6 million dollars or more.  Since that Vesting Event did not

occur, Plaintiffs do not have membership interests in the limited liability company that

would trigger the existence of a fiduciary relationship.  (Id., at 17).  Second, Defendants

contend that, under California law, the "manager's privilege" insulates corporate agents

from individual liability in suits arising from a company's decision to breach a contract.

(Id., at 18)(citing Halvorsen v. Aramark Uniform Services, Inc., 65 Cal. App. 4th 1383,

1392-1396 (Cal. App. Ct. 1998)).  Plaintiffs reject the application of the "manager's

privilege" to this case, claiming that a predominant motive test should be applied in

assessing the principal's breach of contract here as a result of: (1) the manager's

predominant motive being to benefit the principal, Roof Group; and (2) the Agreement

between the Parties was not at will, and the "manager's privilege" only applies to at-will

agreements.  (Pls. Opp'n Br., at 14-15).  Plaintiffs thus conclude that the Complaint's

allegations of motive "prevent the application of the manager's privilege on a motion to

dismiss."  (Id., at 15).

Under both California and New Jersey law, the elements of a breach of fiduciary

duty claim are: (1) the existence of a fiduciary relationship between the parties; (2) the

breach of the duty imposed by that relationship; and (3) damages or harm to the plaintiff

caused by said breach.  See McKelvey v. Pierce, 173 N.J. 26, 800 A.2d 840, 859-60

(2002); City of Atascadero v. Merill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App.

4th 445, 483, 80 Cal. Rptr. 2d 329 (1998).  As stated infra in our analysis of Plaintiffs'

conversion claim, the Court finds that, absent any pled facts beyond the plain terms of the

Agreement regarding a mutual agreement by the parties concerning the triggering event

for the vesting of the membership interests at issue, Plaintiffs have failed to plead that

23

they had vested rights in said interests prior to the "first twelve (12) month period that the Restaurant generate[d] gross revenues of $6 million or more (the 'Vesting Event'). After gross of 6 million." (Defs. Mot. to Dismiss, Ex. A, "Term Sheet"). While Plaintiffs present an alternative interpretation of the term "vest" in their Opposition Brief, nothing in the Complaint itself supports the existence of a fiduciary relationship in existence at the time of the breach. Therefore, because Plaintiffs have failed to sufficiently plead the existence of a fiduciary relationship, the Court need not consider the application of the "manager's privilege" to the facts of this case.

### E.  Accounting (Count V)

Plaintiffs claim that, since "S&S is a member of Roof Group," it is "entitled to an accounting for all receipts and disbursements of Roof Group." (Compl., ¶ 75). Defendants do not address Plaintiffs' request for an accounting in their Motion to Dismiss. "An accounting in equity cannot be demanded as a matter of right or of course. The exercise of equitable jurisdiction to compel an account rests upon three grounds – first, the existence of a fiduciary of trust relation; second, the complicated nature or character of the account; and third, the need of discovery." Borough of Kenilworth v. Graceland Memorial Park Ass'n, 124 N.J. Eq. 35, 37, 199 A. 716 (N.J. Ch. Ct. 1938). Plaintiffs' accounting claim is thus premised on the existence of a fiduciary relationship between Plaintiffs and Defendants. Since the Court has already found infra that Plaintiffs have failed to sufficiently plead the existence of a fiduciary relationship with Roof Group and the Roof Group Defendants, the Court finds that the equities favor denial of Plaintiffs account claim at this time.

### F. Tortious Interference with Contract Claim (Count VI)

In Plaintiffs' Complaint, they allege that Defendants Weinberg, KBKG, Kniss and Hagan (the "KBKG Defendants") knew about the Agreement between Plaintiffs and Roof Group by virtue of Plaintiffs' employment by Roof Group and work in connection with RSLA, but nevertheless "intentionally induced, procured and participated the breach by Roof Group of the Agreement," and, further, that "Roof Group would not have breached the agreement with Plaintiff S&S but for the activities of Weinberg and the KBKG Defendants." (Compl., ¶¶ 79-84). Specifically, Plaintiffs allege that, immediately after Roof Group retained KBKG, Weinberg and the KBKG Defendants "repeatedly made false and defamatory statements to Freeney and West about the nature and quality of services rendered by S&S" and "repeatedly interfered with S&S's duties to attempt to prevent S&S from fulfilling its obligation under the Agreement." (Id., ¶¶ 37-38). Ms. Weinberg is also alleged to have "falsely blamed S&S for her own mistakes including failures to pay invoices on time as well as pay employees their proper wages." (Id., ¶ 39). Plaintiffs claim that Weinberg and the KBKG Defendants tried to force S&S out of its position by "causing Roof Group to demand that Plaintiffs agree to an amendment of the Agreement which would drastically reduce the agreed upon Base Fee and contingent compensation from RSLA and other locations, and to change other terms of the Agreement." (Id., ¶ 40). Further, on November 2, 2010, Weinberg, Kniss, West and Hagen are alleged to have flown to Indianapolis, Indiana to meet in secret with Mr. Freeney, and that during that meeting, convinced Mr. Freeney to terminate S&S in the event Plaintiffs did not amend the Agreement. (Id., ¶ 41). When Plaintiffs offered to amend the Agreement after weeks of negotiation, Defendants rejected their offer, and Plaintiffs assert that it was KBKG that convinced Roof Group to breach the Agreement

by subsequently terminating S&S without cause in a December 22, 2010 letter from Roof Group's counsel. (Id., ¶¶ 41-44).

Defendants argue that Plaintiffs' tortious interference with contract claim should be dismissed for three reasons: (1) Plaintiffs do not allege with specificity any acts from which the Court could conclude that Ms. Weinberg or the KBKG Defendants interfered with the Agreement; (2) the Complaint fails to allege that Defendants engaged in contact that was wrongful or malicious, aside from the alleged interference; and (3) Defendants' actions are protected by the "manager's privilege." (Defs. Br., at 20).

Under New Jersey law, there are five elements of a claim for tortious interference with a contractual relationship: (1) plaintiffs' existing or reasonable expectation of economic benefit or advantage; (2) a defendant's knowledge of the plaintiff's expectancy; (3) wrongful and intentional interference with that expectancy by the defendant; (4) a reasonable probability that the plaintiff would have received the anticipated economic advantage absent such interference; and (5) damages resulting from the defendant's interference. DeJoy v. Comcast Cable Communs., 941 F. Supp. 468, 476-77 (D.N.J. 1996)(citing Pitak v. Bell Atlantic Network Svcs., Inc., 928 F. Supp. 1354, 1369 (D.N.J. 1996))(other citations omitted).

Accepting the facts of Plaintiffs' Complaint as true, the Court finds that Plaintiffs have sufficiently alleged a claim for tortious interference with Plaintiffs' Agreement with Roof Group. Defendants do not contest that an existing contractual relationship existed between Roof Group and Plaintiffs, and the Complaint makes sufficient factual allegations regarding Ms. Weinberg and KBKG's awareness of Roof Group's Agreement with Plaintiffs. Specifically, Plaintiffs allege that Ms. Weinberg, as Mr. Freeney's

financial advisor, directly represented to Plaintiffs information regarding Defendant

Millar, his financial condition and involvement in Roof Group leading up to Plaintiffs'

signing of the Agreement. (Compl., ¶¶ 28).  Ms. Weinberg is also alleged to have

caused Roof Group to retain the services of KBKG as accountants for RSLA, and both

Ms. Weinberg and the KBKG Defendants are alleged to have made false statements to

Mr. Freeney and Mr. West about the services rendered by S&S. (Id., ¶¶ 34-37).  It may

be plausibly inferred from the facts alleged that such interference with Plaintiffs'

prospective benefits under the Agreement was purposeful and that Plaintiffs would have

received the anticipated benefits of the Agreement absent such interference.  Thus, at this

stage, the Court finds Plaintiffs' tortious interference with contractual relations claim

sufficiently pled.   Since the Court finds that the application of the "manager's privilege"

to Plaintiffs' claim is a fact-sensitive question best left for the jury, and since Defendants

cite no case law applying said privilege under New Jersey law to tortious interference

with contract claims, it need not consider Defendants' arguments regarding its application

at this stage of the pleadings.  See Olivet v. Frischling, 104 Cal. App. 3d 831, 840-41,

164 Cal. Rptr. 87 (Cal. Ct. App. 1980)(finding that the "manager's privilege" may apply

to protect a manager in advising his principal to breach a contract with a third party, but

finding no justification in the inducement of a breach for the purposes of competition or

gaining personal benefit, a fact-specific question); Rodin Properties-Shore Mall, N.V. v.

Cushman & Wakefield of Pennsylvania, Inc., 49 F. Supp. 2d 728, 738 (D.N.J. 1999)(not

addressing the applicability of the "manager's privilege" under New Jersey law, but

rather addressing the issue of managerial protection from liability in a tortious

interference with contract claim when their principal is itself a party to the contract).

Finally, the Court does not find the economic loss doctrine applicable to Plaintiffs' claims

of tortious interference with contractual relations as against Defendant Weinberg and the

KBKG Defendants as they are not parties to the contract at issue and are not named as

such in Plaintiffs' breach of contract claim.  Accordingly, the Court finds Plaintiffs'

tortious interference with contractual relations sufficiently pled, and denies Defendants'

Motion to Dismiss said claim.


## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Complaint is

GRANTED in part and DENIED in part.   An appropriate Order accompanies this

Opinion.


DATED: March 21, 2012

Jose L. Linares
United States District Judge